NOTICE

Decision filed 06/03/10, corrected 06/18/10. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-08-0497

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| UNION PLANTERS BANK, N.A., | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellant and | ) Madison County. |
| Cross-Appellee, | ) |
| | ) |
| v. | ) No. 04-L-791 |
| | ) |
| THOMPSON COBURN LLP, | ) |
| | ) Honorable |
| Defendant-Appellee and | ) Daniel J. Stack, |
| Cross-Appellant. | ) Judge, presiding. |

_____

JUSTICE WEXSTTEN delivered the opinion of the court:

The plaintiff, Union Planters Bank, N.A., formerly known as Magna Trust Company (Magna), brought the present action against its attorneys, the defendant, Thompson Coburn LLP (Thompson Coburn), seeking to recover $11,789,053.24 in damages Magna paid in settlement and legal expenses as a result of legal malpractice allegedly committed by Thompson Coburn in the performance of transactional work (giving advice or preparing documents for a business transaction) regarding Magna's termination as a trustee and the transfer of the trust funds following that termination. A jury returned a verdict in favor of Magna in the amount of $3,654,606.40.

Magna appeals, and Thompson Coburn cross-appeals. Magna contends that the trial court erred in (1) "refusing to grant a new trial on the issue of damages[] or alternatively failing to grant a new trial on all the issues" and (2) "requiring the plaintiff to elect between [c]ount I, the professional negligence count, and [c]ount II, the contract count." Thompson Coburn argues that we should reverse the trial court and enter a judgment notwithstanding

1

the verdict in its favor because the trial court erred as a matter of law when it found that Magna owed a fiduciary duty to the creditors of the trusts at issue. For the following reasons, we affirm.

BACKGROUND

This case is a part of the aftermath of litigation that arose out of the scheme orchestrated primarily by James Gibson to defraud several personal injury plaintiffs or their heirs (the injured plaintiffs) of their personal injury settlements that they had structured with Gibson's companies–SBU, Inc., and SBU of Illinois, Inc. (collectively SBU). SBU offered tax-advantaged structured settlements to personal injury plaintiffs under section 130 of the Internal Revenue Code (26 U.S.C. §130 (1994)). In short, under section 130, the injured plaintiffs received a tax shelter by disclaiming any power of direction over the trust funds. In other words, to take advantage of the tax benefits, the injured plaintiffs could not have actual or constructive receipt of the economic benefit of the payments. See *Western United Life Assurance Co. v. Hayden*, 64 F.3d 833, 839-40 (3d Cir. 1995). This meant that the injured plaintiffs could not be designated as beneficiaries of the structured settlement trusts; rather, they were designated as creditors of the trusts.

Recognizing a demand for this type of service, SBU and Magna (it was actually Magna's predecessor, but for simplicity purposes we refer only to Magna) entered into an agreement in 1985 (the 1985 agreement) to offer injured plaintiffs tax-advantaged structured settlements in personal injury cases. Under the terms of the 1985 agreement, Magna agreed to act as the trustee for trusts created pursuant to numerous injured plaintiffs' settlements. SBU agreed that all the bonds it purchased would "be purchased in the name of [Magna] as [t]rustee on behalf of the plaintiff in question" and that the trusts would "show that SBU is the [t]rustor." The agreement further provided that "either party may cancel or terminate the relationship *** upon thirty days['] written notice" and that in the event of a termination SBU

2

retained the right to change trustees. The agreement provided the following as it related to Magna's duties:

"16. Nothing in this document or any other agreement to the contrary notwithstanding, [Magna] shall not have any duty with respect to the safekeeping account to any party to a structured settlement or to the beneficiaries of any trust to be established[,] but it shall hold the account for the sole benefit of SBU and may pay over any and all funds in this account to SBU or its designee at any time provided that said payment does not jeopardize the safe funding of any settlement agreement entered into by SBU or any structured settlement and trusts to be established in conjunction therewith."

Under the 1985 agreement, Magna also agreed to produce a brochure "for the benefit of both SBU and [Magna]" and "to actively market the concept of structured settlements funded by government obligations and to be placed in trust with [Magna] in conjunction with SBU." A brochure was produced and distributed to plaintiffs' attorneys primarily in Madison and St. Clair Counties. The brochure advertised SBU's structured settlement services and stated that the funds were trusteed with Magna. The brochure claimed that utilizing SBU's services could "[a]ssure the safety of income and principal through appropriate irrevocable trusts that will protect the plaintiff and designated beneficiaries." The brochure provided the following in regards to Magna:

"The settlement will be funded through U.S. government obligations and held in an irrevocable trust administered by [Magna]. [Magna] will make all payments to the plaintiff or plaintiff's estate of the funds related to the settlement in accordance with the trust agreement. In addition, the trust company will perform appropriate services, if requested by the parties. Founded in 1901, [Magna] offers complete trust, investment[,] and farm management services through offices located in Belleville,

3

Bloomington, Centralia, Decatur, Granite City[,] and Springfield, Illinois. A subsidiary of Magna Group, Inc., a holding company comprised [*sic*] of financial institutions, [Magna] manages approximately $1 billion in assets."

For several years after the execution of the 1985 agreement, numerous injured plaintiffs settled their lawsuits against various tortfeasor defendants and agreed to structure their settlements with SBU. In creating these structured settlement trusts, three documents were used: (1) the settlement agreement and release between the injured plaintiff and the defendant (the settlement agreement), (2) the assignment and assumption agreement entered into by the injured plaintiff, the settling defendant, and SBU (the assignment agreement), and (3) a separate trust agreement between SBU and Magna for each of the structured settlements (the trust agreement).

The settlement agreement entered into by the injured plaintiff and the defendant set forth that it was "anticipated and contemplated, through documents executed contemporaneously [t]herewith, that the [d]efendant [would] cause a lump[-]sum payment to be made to [SBU]." It provided that if that assignment was made, SBU would be the trustor and sole beneficiary of the trust. The agreement also provided, "[N]o other representations, promises[,] or settlement[s] of any nature whatsoever have been made to or with them and this [settlement agreement] contained the entire agreement between the parties ***." The trust agreement between SBU and Magna, described more fully below, was attached to the settlement agreement.

The assignment agreement, entered into by the injured plaintiff, the settling defendant, and SBU, attached the settlement agreement and set forth that the parties intended to assign to SBU the right to receive the performance of the defendant's obligations. It provided that promptly following the execution of this agreement, SBU would establish, as the trustor and sole beneficiary, the trust described in the settlement agreement.

4

Each trust agreement between Magna and SBU stated that it was being entered into pursuant to a settlement agreement and assignment agreement. It provided that SBU was to fund the periodic payments through the purchase of United States government bonds using the proceeds from the settling defendants, and it stated that the trust was irrevocable and could not be amended by the trustor. Depending on when the trust agreement was entered into, some of the injured plaintiffs were described as secured creditors and others were described as general creditors. The agreement provided, "If the [t]rustee of this trust shall for any reason cease to act as [t]rustee, the [t]rustor shall promptly appoint a successor corporate [t]rustee, subject to confirmation by a court of competent jurisdiction." Further, the agreement provided, "If said [t]rustee shall so cease to act as such, said [t]rustee and the [t]rustor shall give prompt notice thereof to the persons entitled to receive the lump[-]sum and periodic payments provided for herein, and [the] [t]rustor shall give those same persons prompt notice of any appointment or proceedings to confirm the appointment of any such successor corporate [t]rustee."

Attached to the trust agreement for the injured plaintiffs described as secured creditors was a letter addressed to each respective injured plaintiff. The letter was signed by SBU as the trustor and Magna as the trustee and provided, "On behalf of [Magna], the undersigned hereby acknowledges that the following bonds are registered in the name of [Magna] as trustee of the [t]rust *** between [SBU] as [t]rustor/beneficiary[] and [Magna] as [t]rustee ***." The letter also set forth the face value, date due, and identifying numbers of the respective United States Treasury bonds purchased for the injured plaintiff.

Through the use of these three documents, Magna and SBU created approximately 77 structured settlement trusts over the course of roughly eight years. In 1993, however, SBU decided that it wanted to remove Magna as the trustee. SBU sent Magna notice that it intended to cancel their agreement and would be transferring 46 bonds to PrivateBank and

5

Trust Company. Magna, desirous of maintaining its trustee business, sought the advice of its long-standing law firm, Thompson Coburn.

In response to SBU's notice, Magna sent SBU a letter stating that Magna would not voluntarily relinquish its position as trustee because SBU "did not have the authority under the trust documents to unilaterally terminate [Magna's] position as trustee" and because Magna felt it had "a fiduciary duty to the third-party beneficiaries of these trusts to carry out the duties for which [they] were originally retained." Within two weeks of receiving this letter, SBU, Inc., filed suit against Magna in St. Clair County circuit court, alleging two counts: (1) a declaratory judgment action requesting that the trial court determine and adjudicate SBU's rights and terminate Magna as trustee pursuant to the 1985 agreement and (2) a breach-of-contract count seeking money damages for Magna's refusal to voluntarily relinquish its position as the trustee. SBU, Inc. v. Magna Trust Co., No. 93-MR-165 (Cir. Ct. St. Clair Co.) (SBU v. Magna).

## I. SBU v. Magna Litigation

Thompson Coburn agreed to defend Magna in SBU v. Magna and primarily assigned its attorneys Kurt Shroeder and Tom Hennessy to work on the case. After discussing with Magna its position, Thompson Coburn filed a combined motion to dismiss or add necessary parties on Magna's behalf, claiming that the claim should be dismissed because SBU, Inc., failed to reserve in the trust instruments the power to remove the trustee or, alternatively, that the court should require SBU, Inc., to add the injured plaintiffs to the lawsuit because the plaintiffs were necessary parties. SBU, Inc., filed a motion for a summary judgment in support of both of its counts.

On October 15, 1993, Judge Robert Hillebrand denied Magna's motion to dismiss, finding that SBU, Inc., reserved the power to discharge Magna and appoint a new trustee, and found that the injured plaintiffs were not necessary parties. On November 29, 1993,

6

Judge Hillebrand granted SBU, Inc.'s motion for a summary judgment regarding SBU, Inc.'s right to terminate Magna and denied that motion regarding SBU, Inc.'s breach-of-contract claim. In making this ruling, Judge Hillebrand relied on the 1985 agreement in finding that SBU had the right to terminate Magna. Judge Hillebrand stated the following as it related to Magna's duties following its termination as the trustee:

"After termination [SBU, Inc.,] then has the power to appoint a successor corporate trustee and present such nomination to the court for confirmation. At that time notice must be given to the [injured plaintiffs] of each trust. *** Such requirement of notice, however, is not the same as a requirement that the [injured plaintiffs] be made parties to this litigation as necessary parties. The [injured plaintiffs] have no power to prevent the termination of [Magna] as trustee, only the right to be notified and heard as to the appointment of [Magna's] successor."

On August 29, 1994, SBU, Inc., filed an amended complaint adding SBU of Illinois, Inc., as a plaintiff. Because SBU of Illinois, Inc., was not a party to the 1985 agreement, SBU filed a motion for a partial summary judgment, changing its theory that it had the right to terminate Magna under the terms of the 1985 agreement and requesting a declaratory judgment that it had a common-law right as the settlor and sole beneficiary to change the trustee of the trust.

On June 29, 1995, Judge Ellen Dauber took up SBU's second motion for a partial summary judgment. Judge Dauber granted the motion, finding that SBU, as the settlor and sole beneficiary of the trusts in question, was entitled to terminate the trusts "even though the trusts expressly state that they are irrevocable." Magna appealed, requesting that both the November 29, 1993, order and the June 29, 1995, order granting a summary judgment in SBU's favor be reversed.

On August 22, 1995, Magna advised SBU that it was prepared to turn over the subject

7

trust accounts to another trustee, on the condition that if it was successful on appeal, the trust accounts would be returned to Magna and it would be reinstated as the trustee. Magna and SBU then discussed transferring the trusts to First National Bank of Carbondale (First National), and an agreement was reached to transfer the trusts to First National. Despite this agreement, SBU then requested Magna to send the trusts to Crews & Associates (Crews). Thompson Coburn investigated Crews and discovered that Crews was not a qualified corporate trustee. The evidence at the trial established that a qualified corporate trustee was licensed under a regulatory body as a corporation to be engaged in the offering of trust services to the public. In this case, that regulatory body would be the State of Illinois.

Magna questioned Crews' trust powers with SBU, and SBU changed its request, again requesting that the trust funds be sent to First National. Magna then transferred 15 trusts to First National (the 1995 transfers), based upon the terms mentioned above, but agreed with SBU to keep the remainder of the trusts until the appeal was decided. The 15 trusts transferred to First National are not at issue in this case.

A few days after transferring these trusts, Magna notified SBU that under the trust agreements, Magna and SBU were required to give prompt notice to the injured plaintiffs that Magna was ceasing to act as the trustee. SBU responded by sending Magna a letter stating the following: "If you carefully review the orders of Judge Hillebrand, you will readily come to the conclusion that the only entity to whom notice is to be given is [SBU]. Notice sent to anyone else will constitute an additional breach of [Magna's] fiduciary duty to [SBU]."

Seeking clarification, Magna filed an application for the advice and the instructions of the court, requesting, *inter alia*, the court to confirm the successor trustee, instruct SBU and Magna on the proper procedures to be followed by SBU in obtaining the confirmation of a successor trustee, and state the proper procedures to be followed in the transfer of trust

8

assets to a confirmed successor trustee.

On October 16, 1995, Judge Hillebrand heard argument on Magna's application for advice and instructions. At that hearing, Judge Hillebrand asked Thompson Coburn if it thought it had any right to object to whom SBU appointed as successor trustee. Magna's attorney, Hennessy, replied as follows:

"I think, your Honor, in one of the instances–and this is more than a hypothetical–we're not suggesting any malicious intent on the part of SBU or any improper intent, but one of the–their proposed transferee trust fiduciaries, we questioned the corporate powers of that fiduciary to serve as a trustee. So to answer your question, I think as long as we're in the role of fiduciary we would have an obligation to look at that and bring to the attention of the [c]ourt matters that pertain *** to the proper administration of the trust and as, of course, SBU can do that, and if I heard [SBU's attorney, Tom Ducey,] correctly, it was my understanding that they were going to seek confirmation of these individuals in any event. If that is done and done properly, we certainly have no desire to take the lead in that. We just want to make sure it's done and done properly before we transfer any assets."

Later on in the hearing, Hennessy stated the following to the court:

"The only thing that [Magna] as fiduciary is concerned about, we do not want to rely upon the hope that SBU will discharge its contractual responsibility to the plaintiffs and, your Honor, we are holding this money. We hold this money in trust. Now there may be more than one fiduciary obligation owed, which is another reason why we should have court guidance on this thing. The notice, your Honor, I think, is absolutely essential, and obviously the notice, the form of it, the substance of it would be perfectly appropriate for this [c]ourt to approve. It would not be a pejorative SBU [is] bad and [Magna] is good. It would just be a notice, factual notice of proof. That's

9

all with–or if the [c]ourt is not inclined to do that–I want to make that clear though–we need some protection against–we need clear guidance and direction. If the [c]ourt believes that notice is not required and that we are not to provide notice, then the [c]ourt should so indicate, so that when the–when these folks find out that the Last National Bank of Jamaica is now administering their trust assets, they can't come back at us. On the other hand, if we–the [c]ourt thinks we should and wants us to, the [c]ourt should direct us to so that SBU doesn't come back and sue for a breach of fiduciary duty because we told these injured people about the transfer of the assets." Judge Hillebrand responded by stating as follows:

"The question as I see it is one of relationships, and that's why I asked the questions that I asked, and as I see this, the relationship of fiduciary exists between Magna and SBU and SBU of Illinois. There's [*sic*] two entities. Magna owes its fiduciary relationship to SBU. SBU has the authority under the agreements, as previously has been found, to terminate, and SBU has–and the only obligation that Magna has at the present time is to join with SBU to give notice of the fact that Magna is no longer trustee, which is provided in [the trust agreement], and the notice is to be given to the persons to whom periodic and lump[-]sum payments are provided for, and that is clearly the injured plaintiffs or whoever is receiving the money under the settlement agreements. Any other kind of construction of those words would be absolutely meaningless, and there is adequate evidence to indicate that those are the persons described because, in fact, it says that they are the persons to whom the payments are to be made. So, [Magna], your job is to join with SBU in giving notice to those persons that you are no longer trustee. That is your sole obligation."

The next day, Hennessy wrote Magna's president, Roger Beaman, stating in relevant part as follows:

"In ruling on [Magna's] [a]pplication for [a]dvice and [i]nstructions of [c]ourt, Judge Hillebrand stated that the only fiduciary obligation [Magna] has is owed to [SBU]. This is a significant ruling because it relieves us from the worry of what the payee beneficiaries may do if we comply with the instructions of [SBU]."

Two days later, Hennessy hand-delivered Judge Hillebrand a letter regarding a proposed order. In that letter, Magna stated in pertinent part as follows:

"[O]ur proposed order clearly requires us to join in giving notice as to the termination of [Magna]. The SBU draft purports to require us to join in providing notice regarding the appointment of a successor trustee. Under the provisions *** of the trust it is the [t]rustor who '. . . shall give those same persons prompt notice of any appointment or proceedings to confirm the appointment of any such successor corporate [t]rustee' ***. Additionally, our proposed order in that paragraph clearly reflects the court's statement that upon [Magna's] termination its only obligation is to provide notice regarding termination."

On November 3, 1995, the court entered its order on Magna's application for advice and instructions. In its order, the court ruled that "[t]he only fiduciary relationship of [Magna] under the subject trust agreements is with [SBU]," that Magna had "no fiduciary obligations under said trust agreements to any other persons," and that "[u]pon the termination of [Magna] as trustee of the subject trusts, [Magna's] obligation is to join with [SBU] in giving notice as to the termination of [Magna] as trustee to the persons entitled to receive the lump[-]sum and periodic payments." As Thompson Coburn requested, Magna was not ordered to provide notice of the successor corporate trustee to the injured plaintiffs.

About a week later, on November 10, 1995, Magna and SBU sent a joint notice of the termination of the trustee to the injured plaintiffs. The notice provided as follows:

"PLEASE TAKE NOTICE that pursuant to [SBU's] direction, [Magna] has

11

been terminated as [t]rustee of that certain [t]rust [a]greeement *** by and between [SBU] and [Magna]. This [j]oint [n]otice of [t]ermination of [t]rustee is given to you as a person to receive the lump[-]sum and periodic payments under said [t]rust [a]greement. Inquiries should be directed to [SBU]."

Despite sending this notice of Magna's termination, Magna continued to act as the trustee for the 62 trusts that it had agreed with SBU to keep until after its appeal was decided. (As mentioned previously, 15 other trusts had been transferred to First National before the notice was sent.)

About a year after this notice was sent, Ducey withdrew as counsel for SBU. After the hearing on Ducey's motion to withdraw, Ducey "volunteered" to Hennessy that all the trusts that had been transferred to First National had been transferred subsequently to a company called Flag Finance Company (Flag), "which is apparently a Missouri [c]orporation, apparently associated with SBU, with offices in Missouri." Two days later, Hennessy sent Magna a letter advising it that Ducey was apparently at odds with SBU, that Ducey volunteered that all the trusts had been transferred to Flag, and that Ducey said an "inexperienced" lawyer from another law firm gave Flag a legal opinion that it could exercise trust powers without being qualified to do business as a trust company. Hennessy also indicated that Ducey "thought that the legal advice allegedly given by [the other law firm] was incorrect and that as a result, all of the trusts have been transferred in breach of a fiduciary duty." Hennessy wrote, "All of this information may prove very helpful when the trial court considers this case after the case on appeal is resolved."

At this point, Thompson Coburn began to investigate Flag. Magna and Thompson Coburn discovered that Flag was not authorized or regulated to be a trust company under the laws of Illinois or Missouri and that Flag was controlled by Gibson, his wife, and his daughter. Thompson Coburn and Magna became suspicious that Gibson had diverted the

12

money it had previously transferred to First National and began monitoring Gibson and his publicly known grocery store venture.

On May 2, 1997, concerned that Magna might be liable for its involvement in the 1995 transfers, Magna requested Thompson Coburn to send its auditor a letter in regards to Magna's potential culpability. That letter provided in relevant part as follows:

"We have recently learned that the trust assets [that were transferred to First National] were transferred shortly after transfer to [First National] at the direction of or to an entity named [Flag], a Missouri corporation whose first stated purpose in its [a]rticles of [i]ncorporation is 'To provide consumer loans.' Nothing in its articles describes one of its purposes as providing trust services and we have no reason to believe it is so licensed by the Missouri Division of Finance. We are currently attempting to determine the facts in this matter but it would appear that Magna acted following a valid order of court in taking the action it took and that the trust funds may have been improperly transferred by [First National]. We note that the registered agent of Flag and the principal of [SBU] are the same individual.

It is not possible to predict the outcome of this matter of the extent of [Magna's] liability, if any, at this time."

In May 1997, Thompson Coburn met with SBU's new attorney, David Helfrey. At this meeting Thompson Coburn informed Helfrey that Magna was concerned "because of a recent revelation that the trust assets transferred from Magna to [First National] had subsequently been transferred by [First National] to [Flag], which [Magna and Thompson Coburn] understood to be controlled by Mr. Gibson." Thompson Coburn told Helfrey that Magna "would consider accepting the return of the trust assets at this time conditioned upon an agreement between SBU and [Magna] for Magna's administration of the trusts at a level of compensation to be mutually agreed upon by the parties." "In the alternative, [Thompson

13

Coburn] suggested that SBU consider providing [Magna] with assurances that the trust assets are being held by an entity that is financially responsible and that possesses trust powers." SBU took no action and assured Thompson Coburn that if Magna won on appeal, the issue would be resolved then.

On July 29, 1997, this court issued its unpublished order in *SBU, Inc. v. Magna Trust Co.*, affirming both of the circuit court's summary judgments. *SBU, Inc. v. Magna Trust Co.*, No. 5-95-0557 (1997) (unpublished order under Supreme Court Rule 23 (166 Ill. 2d R. 23)). This court found that the personal injury plaintiffs were merely general creditors and not necessary parties to the litigation and that the "termination of Magna as trustee [did] not alter SBU's promise to the personal injury plaintiffs that it [would] pay them a certain amount of money on specific dates." *SBU, Inc.*, order at 9. The court noted as follows: "Based upon our review of the briefs in this case, the only real issue is as follows: Can SBU terminate Magna as trustee of the trusts in question? The resolution of this issue in no way impacts upon the personal injury plaintiffs. SBU continues to be responsible to pay the plaintiffs even if Magna is terminated as trustee. As such, the personal injury plaintiffs cannot be necessary parties to this litigation." *SBU, Inc.*, order at 9.

II. Magna's Termination as Trustee and Subsequent Transfer of Trust Funds

After the appellate court decision was filed, Thompson Coburn advised Magna that an appeal to the supreme court would likely be unsuccessful, but Magna was still concerned about future litigation with the injured plaintiffs if something happened to the trust funds after the funds left Magna. Ultimately, Magna decided not to appeal. Magna, however, still held the trust funds and went to Thompson Coburn for advice regarding how to proceed. Thompson Coburn assigned Robert Brownlee to be involved in the termination of Magna as the trustee. Hennessy and Shroeder were not heavily involved in Magna's termination.

After hearing nothing for several months from SBU regarding Magna's termination,

14

Magna became frustrated that it was still administering these trusts and desired to begin the process of its termination as the trustee. Thus, Magna discussed with Thompson Coburn its desire to transfer the remaining trusts and requested Thompson Coburn to take the lead in that regard. Magna knew that Gibson was preoccupied with litigation involving his grocery store venture and therefore did not want to wait on Gibson to begin this process. Unfamiliar with the previous court rulings in *SBU, Inc. v. Magna Trust Co.* and the fact that Magna had fought to prevent its having to take part in the appointment of the successor corporate trustee, Magna's new president, Matt Finn, who had replaced Beaman as president and point man with Thompson Coburn in January 1997 when Magna became a part of Union Planters Bank, asked Brownlee if Magna could add a sentence to the original notice Magna and SBU had sent to the injured plaintiffs back in November 1995 naming the successor corporate trustee. Brownlee advised Magna that it could add the name of the successor corporate trustee to the notice and, in fact, advised Magna that getting a court order naming the successor corporate trustee would help protect it against any actions by the injured plaintiffs.

Around October 1997, approximately three months after the appellate court decision in *SBU, Inc. v. Magna Trust Co.* was filed, discussions ensued between SBU and Magna regarding "Magna's willingness to voluntarily allow trusts remaining at Magna to be moved to another corporate trustee." Brownlee informed Helfrey that Magna intended to comply with the "substance" of the appellate court's ruling in *SBU, Inc. v. Magna Trust Co.* and with Judge Hillebrand's October 16, 1995, ruling, whereby the court ordered Magna to join with SBU to give prompt notice to the injured plaintiffs that Magna was no longer the trustee. Brownlee noted as follows:

"While the duty to obtain court approval is not Magna's, it would appear that since the St. Clair County [c]ircuit [c]ourt has reacquired jurisdiction it should be a simple matter for SBU to obtain that approval. If it is possible to obtain such

15

approval promptly through a stipulation and agreed order, we would request that the joint notice to the ultimate payees identify the new trustee and [c]ourt's confirmation thereof."

Four days later, on October 10, 1997, Gibson wrote Magna indicating that SBU "would like to begin the timely and orderly transfer of [his] personal trusts and those of [SBU] to the successor trustee." He indicated that Flag would be the successor trustee, and he said that a representative from Flag would be in contact with Magna on October 15, 1997, to initiate the necessary steps. It is unclear from the record whether a representative from Flag ever contacted Magna.

Almost a month after receiving Gibson's letter indicating that someone from Flag would contact Magna to begin transferring the trusts, Brownlee again contacted Helfrey, requesting SBU to give joint notice of Magna's termination as it had done in the past and also asking Helfrey to get SBU's authorization "to join with Magna in a stipulation for presentation to the [c]ircuit [c]ourt for approval of the form of that notice and, for SBU's protection, acknowledgment and approval of the identity of the new [t]rustee." About a week later, Brownlee sent a fax to Helfrey with a revised stipulation and proposed order. In the fax, Brownlee stated as follows:

> "I contacted the [c]ivil [d]ivision's clerk's office and was told that the preferred approach from the [c]ourt's point of view would be for us to sign and present the [s]tipulation and [p]roposed [o]rder, accompanied by a letter asking the [c]ourt to enter the [o]rder if we wish, and since it is not contested, the [o]rder should be entered in the ordinary course. I asked if we could expedite the entry of the [o]rder and was told that Judge Hillebrand is not really hearing any informal matters at present."

On November 25, 1997, Brownlee and Helfrey appeared before Judge Annette Eckert, with the stipulated and proposed order prepared by Brownlee. SBU and Magna filed the

16

stipulation and proposed order, and Judge Eckert approved it. Brownlee did not tell Judge Eckert that Flag was not a qualified corporate trustee or that he knew that Flag and SBU were controlled by Gibson. The order stated in relevant part as follows:

"4. On October 16, 1995, at a hearing before this [c]ourt pending the above-referenced appeal, Judge Hillebrand stated that '. . . the [c]ourt therefore orders [Magna] as current [t]rustee to join with the [t]rustor to give prompt notice to all of those persons that [Magna] is no longer the [t]rustee' [relating to the trusts which were the subject of the appeal herein]. Thereafter, Magna and SBU did forward a [j]oint [n]otice of [t]ermination of [t]rustee to those persons entitled to receive the lump[-]sum and periodic payments under the involved trust agreements.

5. As the appeal has been concluded and the issues raised therein adjudicated by the Illinois Appellate Court, Magna is desirous of complying with the rulings therein and is preparing to transfer the remaining trusts to Flag as successor corporate trustee as requested by SBU. Magna also desires, however, to comply with the substance of Judge Hillebrand's ruling as to notice entered October 16, 1995, and SBU is desirous that Flag be confirmed as successor trustee by this [c]ourt, which is a court of competent jurisdiction for such purpose."

The same day, Judge Eckert entered an order confirming Flag as the successor corporate trustee and ordering Magna and SBU to send a joint notice to the injured plaintiffs in the form attached to the proposed order.

On December 22, 1997, Magna sent a letter to SBU and enclosed documentation for the timely transfer of all SBU assets from Magna to Flag. The next day, Brownlee faxed Helfrey, indicating Magna's desire to wire the funds. On December 24, 1997, apparently unable to wire the funds, Finn sent a letter to Gibson stating the following:

"Under court order dated November 25, 1997, a copy of which is enclosed[,]

17

[Flag] has been confirmed as successor corporate trustee and [Magna] has been terminated. Therefore we believe we have no authority to continue to hold these assets. Please find enclosed a check for $347,675.07 representing the cash in the accounts. We are attempting to transfer the remaining assets as soon as we receive delivery instructions. If you do not provide us with delivery instructions, the remaining assets will be placed in escrow."

On December 26, 1997, Flag sent the check back to Magna. Around this time Magna knew that Flag was unqualified to administer these trusts and even joked about how incapable it thought Flag was to act as the trustee over these trusts. On December 29, 1997, Brownlee wrote Helfrey indicating Magna's frustration that Magna was continuing to serve as the trustee after Magna and SBU had agreed early the previous week to transfer the remaining trusts to Flag. Brownlee told Helfrey: "If we cannot resolve this matter on an immediate basis, we will proceed in St. Clair County [c]ircuit [c]ourt to compel acceptance of the assets and seek the earliest possible hearing. I hope we can avoid such proceedings by simply receiving wire instructions on which we are prepared to act at once."

Apparently shortly thereafter, a resolution took place, and Magna did not file a motion to compel in the circuit court. Sometime between January 1, 1998, and January 19, 1998, the trust funds were transferred from Magna to Flag (the 1998 transfers). Magna and SBU sent a joint notice of the termination of the trustee to the injured plaintiffs following those transfers. That notice stated as follows:

"PLEASE TAKE NOTICE that pursuant to the direction of [SBU], [Magna] has been terminated as the trustee of that certain trust agreement *** by and between [SBU] and [Magna]. This [j]oint [n]otice of [t]ermination of [t]rustee is given to you as a person to receive a lump[-]sum and/or periodic payments under said trust agreement. Inquiries should be directed to [SBU]. The successor corporate trustee

18

is [Flag]."

On May 6, 1999, a confidential source informed Thompson Coburn, *inter alia*, that the trust funds Magna had transferred to Flag flowed from Flag to SBU and then from SBU into Gibson's failing grocery stores. Thompson Coburn notified Finn that it had received this information, but Magna chose to take no action because it thought that it was too late and it assumed that the trust funds were already gone.

The injured plaintiffs continued to receive their payments until approximately April or May 2000. As it turns out, Magna's and Thompson Coburn's suspicions about Gibson had merit, and Gibson spent his clients' money on unauthorized business transactions, high-risk investments, and purchases of real estate and luxury items for his own use. When Gibson found out that his scheme was about to go bust, Gibson fled to Belize and wired more of his clients' trust funds to Belize bank accounts. Eventually, Gibson was arrested in Belize and was returned to the United States. Gibson was indicted and convicted and was eventually sentenced to 40 years' imprisonment. *United States v. Gibson*, 490 F.3d 604 (7th Cir. 2007). Thereafter, the injured plaintiffs brought lawsuits to recover the structured settlement funds. The plaintiffs sued many defendants, including Gibson's accountants and trust companies, like Magna, that had administered these trusts. The total loss to the injured plaintiffs was more than $156 million. The lawsuits filed by the injured plaintiffs relevant to this case are Topsakalyan v. Gibson, No. 00-L-011030 (Cir. Ct. Cook Co.); Gaudreault v. Union Planters Bank, N.A., No. 01-L-535 (Cir. Ct. Madison Co.); McCracken v. Magna Bank, N.A., Cons. Nos. 01-L-437, 01-L-569 (Cir. Ct. St. Clair Co.); James v. Union Planters Bank, No. 02-L-103 (Cir. Ct. St. Clair Co.); and Hicks v. Magna Bank, No. 00-L-88 (Cir. Ct. Marion Co.).

### III. The Injured Plaintiffs' Litigation Against Magna

Initially, when the injured plaintiffs filed suit against Magna, Thompson Coburn continued to represent Magna. One of the first cases to be filed against Magna and several

19

other defendants was brought in the circuit court of Cook County on behalf of approximately 55 of the injured plaintiffs (Topsakalyan). Oddly enough, the injured plaintiffs' attorney in Topsakalyan was SBU's former attorney, Ducey. Ducey alleged "that in violation of the trust agreements and their fiduciary duties, the defendant banks transferred their respective trusts to non[]corporate trustees, namely [Flag], [Crews], and CIBC World Markets Corporation." Ducey claimed that Magna owed the injured plaintiffs fiduciary duties because the injured plaintiffs were trust beneficiaries. On behalf of Magna, Thompson Coburn filed a motion to dismiss the count against it, arguing that Magna owed the plaintiffs no fiduciary duties.

Meanwhile, while Magna's motion to dismiss was pending in Topsakalyan, approximately 60 injured plaintiffs filed a class action lawsuit in St. Clair County circuit court (James). The injured plaintiffs in James originally claimed, *inter alia*, that Magna violated the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2000)) by wrongfully and intentionally concealing the existence of the 1985 agreement from the injured plaintiffs. The plaintiffs alleged that had they known of the 1985 agreement, they would not have entered into the structured settlements and therefore would not have suffered their losses.

In another St. Clair County case, Bernard Ysursa represented many of the same James plaintiffs in McCracken. In McCracken, the "plaintiffs allege[d] Magna knew and did not disclose Gibson owned SBU and [Flag] and that Flag was not qualified to act as a fiduciary." The plaintiffs alleged that Magna "breached its trust duty to plaintiffs at the time of the transfer of the trust assets to Flag."

Rex Carr, Magna's attorney in this case, also brought a lawsuit in Madison County circuit court against Magna on behalf of four of his former clients (Gaudreault). In Gaudreault, the plaintiffs were all secured creditors under the terms of their structured settlement agreement, and they claimed that Magna breached its duty by transferring the

20

plaintiffs' security interest to Flag, which was not a proper corporate trustee, in violation of the trust agreement between SBU and Magna.

Finally, in Marion County, another lawsuit was brought on behalf of a single plaintiff, Blake Hicks (Hicks). In Hicks the complaint stated, "[T]he theory of liability centers upon the 1997 stipulation and joint notice." The distinguishing characteristic of the Hicks case was "that Magna acted not only as trustee[] but as guardian of the minor plaintiff's estate." The plaintiff alleged "that Magna (as guardian) should have done more to protect the assets of its ward."

While this litigation was pending, Magna and Thompson Coburn discovered that Thompson Coburn might be implicated for the injured plaintiffs' losses. Recognizing a potential conflict, Thompson Coburn withdrew from representing Magna in any cases involving SBU and recommended that Magna hire the law firm of Freeark, Harvey, Mendillo, Dennis, Wuller, Cain & Murphy, P.C. (the Freeark Firm). Magna is suing Thompson Coburn in this case for the $1,084,419 it paid Thompson Coburn in defending Magna in the cases brought against Magna by the injured plaintiffs.

On December 5, 2002, the Cook County circuit court in Topsakalyan granted Magna's motion to dismiss with prejudice. After this ruling, Ducey orally made a motion to amend the plaintiffs' complaint, but the court denied the plaintiffs' request for leave to amend the complaint against Magna. Ducey did not present a proposed amended pleading at the time he made the oral motion. The injured plaintiffs appealed, contending, *inter alia*, that the trial court erred in granting Magna's motion to dismiss and in denying their motion for leave to amend the complaint. Ducey was eventually removed as counsel for the injured plaintiffs, but the record is unclear about the reasons for his removal. Ysursa became new appellate counsel and filed a supplemental brief, contending that the injured plaintiffs should be granted leave to amend their complaint to include two new theories of liability.

While Topsakalyan was pending on appeal, however, the St. Clair County circuit court in McCracken entered an order granting the plaintiffs' motion for a summary judgment on liability only. In that order, the court concluded that based upon all the circumstances, Magna owed the injured plaintiffs a duty in trust. Further, the court specifically rejected Magna's defense that it acted in good faith in relying on Judge Hillebrand's November 3, 1995, order. The court found that when Magna and SBU presented the joint stipulation and proposed order to Judge Eckert on November 25, 1997, "Magna cast aside Judge Hillebrand's directive of November 3, 1995[,] to limit [its] participation in the transfer to no more than sending notice of its termination to the plaintiffs." The court concluded that Magna acknowledged that it had not complied with Judge Hillebrand's order by using the phrase that it intended to "comply with the substance of Judge Hillebrand's ruling since the point of the instruction was to take Magna out of the confirmation process." The court's order continued as follows:

"Magna's use of the stipulated order to confirm Flag is not a minor deviation from Judge Hillebrand's instructions and its obligations under the [t]rust [a]greement. Had Magna limited its participation in the manner determined by Judge Hillebrand, Magna would have sent plaintiffs a [n]otice that it was no longer engaged to act as corporate trustee of the structured settlement accounts. This would have put plaintiffs on notice of the change in trustee. Under Judge Hillebrand's instruction, SBU, acting alone, would then have been required to seek confirmation of Flag as successor trustee. Under the [t]rust [a]greement, SBU was then required to give plaintiffs prompt notice of 'proceedings to confirm the appointment of any such successor corporate [t]rustee.' [Citation.] Had plaintiffs been on notice that SBU was switching horses, they would have had the option to intervene in 'proceedings to confirm' [Flag]. By concocting the [s]tipulation and [o]rder appointing Flag, Magna joined together

22

with SBU to gut the very purpose of the notice provision of the [t]rust [a]greement, *i.e.*[,] to allow the plaintiffs an opportunity to be heard in the court proceedings to confirm its successor trustee. With its insistence on seeking court confirmation of Flag by stipulation on November 25, 1997, Magna annihilated any defense premised upon good faith or upon the Restatement (Second) of Trusts Section 201, Comment (b).

Magna's actions lacked good faith in another regard. In the [s]tipulation and [p]roposed [o]rder presented to Judge Eckert, Magna represented to the [c]ircuit [c]ourt that Flag was a corporate trustee. With knowledge of Gibson's control of Flag and knowledge that Flag was not a qualified fiduciary, Magna asked Judge Eckert to confirm Flag as successor corporate trustee. This misrepresentation to the court vitiates any good[-]faith defense reliant on the stipulated c/y/a[1] court order consequently obtained by Magna. The misrepresentation was compounded in [the] [j]oint [n]otice of [t]ermination of [t]rustee sent to the structured settlement plaintiffs dated January 1, 1998. In the [n]otice Magna announced the untruth that Flag was a 'corporate trustee.'

Instead of providing a defense to Magna, Magna's conduct created additional duties to the plaintiffs. After the circuit court proceedings before Judge Hillebrand, Magna engaged in a course of conduct designed to protect its interests and maintain control of plaintiffs' accounts. Ultimately, Magna's conduct allowed Flag's appointment. A party may assume a duty to disclose information accurately by its conduct. In so conducting itself Magna undertook a duty not to deliberately conceal or misrepresent. See *Union Nat. Bank and Trust Co. of Joliet v. Carlstrom*, 134 Ill. App. 3d 985, 989, 481 N.E.2d 300, 302 (1985)."

---

[1]Testimony adduced at the trial indicates that "c/y/a" stands for "cover your ass."

The court went on to grant a summary judgment in favor of the injured plaintiffs on counts I (breach of contract), II (consumer fraud), and IV (breach of fiduciary duty), leaving only the issues of proximate cause and damages for the finder of fact under those counts. The court also found that factual issues remained on counts III (common-law fraud) and V (conspiracy and consumer fraud).

After this order came down, the Freeark Firm recommended that Magna sue Thompson Coburn for malpractice. To that end, about a week after this order was entered, the Freeark Firm sent a letter to Thompson Coburn on behalf of Magna, asking Thompson Coburn to indemnify it in McCracken and in the other cases against Magna in which its liability is based upon Thompson Coburn's acts on behalf of Magna. Thompson Coburn refused to indemnify or represent Magna. In April 2003, Magna filed suit against Thompson Coburn.

On September 12, 2003, about a week before the Gaudreault case was set to go to trial, at the Freeark Firm's recommendation Magna decided to settle the Gaudreault case with Carr. Ransom Wuller, of the Freeark Firm, testified that Magna chose to settle Gaudreault because the court had denied its motion with regard to duty. He testified, "It was my determination at that time that if the [c]ourt had ruled there was a duty, and the [c]ourt had clearly I think done that by–by denying [Magna's] [m]otions to [d]ismiss, by striking our affirmative defenses with regard to that, I felt there was no defense to what was done in 1997 so that we had to settle the case at that point." Magna paid approximately $2.2 million to settle Gaudreault, representing 100% of the injured plaintiffs' losses. Magna brought third-party claims against several parties and recovered $917,609 from other defendants. Magna is not suing Thompson Coburn for the amount it recovered in contributions from other defendants. Magna is seeking $1,478,721 for the amounts it paid in settling Gaudreault.

After settling the Gaudreault case, the Freeark Firm recommended that Magna hire

24

Carr to represent Magna in this malpractice action against Thompson Coburn. Wuller testified he did this because he knew that his firm would likely be a witness in this case and because Carr was a good lawyer.[2] Carr agreed to represent Magna. Around this time, Wuller wrote a letter to Magna's legal division, providing a brief synopsis of the cases Magna had pending against it by the injured plaintiffs. In that letter, Wuller stated the following with regard to Magna's defense and settlement strategy:

"The simple fact of these cases is that few if any of the defendants can afford to take the risk of going to trial. Thus, the overall goal is to posture the cases in such a way as to achieve the most favorable settlement possible. *** Thompson Coburn is not included in the list above [ranking culpability among all the parties] for the reason that only [Magna] has a viable cause of action against it, but we are optimistic that we will be able to pass a significant portion of the cost of this litigation on to Thompson Coburn."

At some point after the trial court's summary judgment in McCracken, the attorney for the injured plaintiffs in McCracken, Ysursa, entered an appearance to also represent the injured plaintiffs in James. James and McCracken were both in front of Judge Robert P. LeChien, the judge who had authored the summary judgment in McCracken. In James, Judge LeChien granted the plaintiffs' motion to amend their complaint to assert the same claims upon which the court had entered a partial summary judgment in favor of the plaintiffs in McCracken. Because of this, these two cases were negotiated and settled together, rather than separately.

---

[2]Ironically, Carr himself also became a witness in this case when Thompson Coburn insinuated that Carr and the other injured plaintiffs' personal injury attorneys, who advised their clients to enter into the structured settlement trusts with SBU, were to blame for the injured plaintiffs' losses.

During the settlement negotiations in McCracken and James, an agreement was reached between Magna and the injured plaintiffs' attorneys whereby the injured plaintiffs' attorneys agreed to file an amended complaint against Magna as a part of the settlement agreement. The Freeark Firm drafted the amended complaint against its own client, Magna. The Freeark Firm then had the plaintiffs' attorneys file the amended complaint it had drafted against Magna. Three days later, McCracken and James were settled.

Ultimately, Magna settled McCracken and James for approximately $5,728,425. Magna agreed to pay 50% to 90% of the net losses associated with the 1998 transfers, but it only ended up paying 50%. The other defendants in that case paid the other 50%. The Freeark Firm estimated the total net exposure in McCracken to be $17.5 million. Ysursa testified that he obtained a partial summary judgment on the consumer fraud count and could have had a nonjury trial on that claim. He claimed that he could have collected 100% of the damages against Magna and could have recovered attorney fees and punitive damages. Wuller agreed, testifying as follows:

"If we went to trial in the [McCracken] case or if we went to trial in front of Judge LeChien with regard to these cases, he was going to find against [Magna]. He was going to award [100%] damages, and he was going to award punitive damages against my client. And there was no question about it."

He further stated as follows:

"I think, first of all, with regard to the [James] case and with regard to [the consumer fraud count], I think the [j]udge would have [had] a lot of discretion as to what the award would be, and I certainly *** think that at a minimum we would have had a 20 million dollar judgment. I don't think there is any doubt about that. It certainly could have gone higher. It could have gone up to 40 million[;] that was certainly a consideration."

26

In Hicks, Magna settled for $2.5 million. Wuller testified that the plaintiff was seeking $20 million in damages and that he thought it would take $5 million, without attorney fees, to put the injured plaintiff back in the same position he would have been in had Gibson not stolen the trust funds. He testified that Magna paid substantially more than any other defendant paid to get out of the Hicks case. He also admitted that he had stated in his deposition that he did not believe that Magna would be able to recover any damages from Thompson Coburn in Hicks because of the theory alleged in that case and the fact that Magna was also the guardian of the minor plaintiff's estate. Like in McCracken and James, Wuller testified that he had drafted an amended complaint against Magna which he had the injured plaintiffs file. Similarly, three days after it was filed, the joint motion to approve the settlement was filed.

On March 25, 2005, the First District Appellate Court issued a Rule 23 order in *Topsakalyan v. Gibson*, No. 1-03-0539 (2005) (unpublished order pursuant to Supreme Court Rule 23). The court affirmed the circuit court's judgment of dismissal in Topsakalyan, finding that SBU was the sole beneficiary of the trusts and that, therefore, because the plaintiffs were not beneficiaries of the trusts, Magna did not owe them fiduciary duties. The court also found that the trial court did not abuse its discretion in denying the plaintiff's motion to amend its complaint, noting, "Plaintiffs have not provided a record citation to their request to amend or to the court's denial of that request so as to aid us in evaluating their contention." *Topsakalyan*, order at 10. The court stated, "In effect, plaintiffs desire a 'do over' as the result of what they perceive as missteps by their original appellate counsel." *Topsakalyan*, order at 20. The court continued: "[The plaintiffs] simply want a chance to plead theories of recovery that their original counsel could have presented to the trial court but did not. We decline to exercise our equitable powers to grant plaintiffs the extraordinary relief which they seek." *Topsakalyan*, order at 21.

27

## IV. Magna v. Thompson Coburn

On March 20, 2008, several weeks into the trial, Magna filed its second amended complaint, alleging two counts: (1) negligence and (2) breach of contract. Magna claimed that it should be awarded approximately $11,789,053, consisting of $1,084,419 it paid Thompson Coburn in attorney fees, $997,486 it paid the Freeark Firm in attorney fees, $1,478,721 it paid to settle Gaudreault, $2.5 million it paid to settle Hicks, and $5,728,425 it paid to settle McCracken and James. In its contract count, the count that ultimately went to the jury, Magna, alleged, *inter alia*, as follows:

"11. That in the months of October and November, 1997, Thompson Coburn agreed, and undertook in providing said legal services, to obtain the approval of, and confirmation from, the [circuit court] of the appointment of a proper successor corporate trustee to which Magna could transfer certain treasury bonds in the face value amount of $20,000,000.00 to $40,000,000.00, more or less, including those bonds held by Magna for the benefit of the injured plaintiffs ***.

12. That Thompson Coburn breached said contract by obtaining [c]ircuit [c]ourt appointment, on the 25th day of November, 1997, in collaboration with SBU, of [Flag], the alter ego of SBU and Gibson, as successor trustee, merging SBU, beneficiary of the trusts, with Flag, trustee of said trusts, resulting, thereby, in a termination and dissolution of said trusts when a reasonably well[-]qualified attorney would know that a merger and dissolution would result, if the court appointed a trustee which was the alter ego of the beneficiary.

13. That Thompson Coburn breached the said contract when it failed to advise the [c]ourt, to whom the joint-stipulated order was presented for entry, of the knowledge that it had as to the fact[s] that Flag was not a qualified successor corporate trustee under the trust agreements authorized under the laws of the States

28

of Illinois and Missouri to conduct a trust business[,] was not empowered by its charter to act as a trustee such as a bank or trust company[,] was not a licensed corporate trustee under the laws of Missouri or Illinois[,] [and] was owned by Gibson[,] who believed the trust funds were his to invest as he so chose to invest[,] and[] that the entry of the order appointing Flag as trustee would cause a dissolution and termination of the trusts.

14. That Thompson Coburn breached the said contract when it failed to advise Magna of the consequences and risks of the actions of its attorney, an officer of the court, in failing to inform the [c]ourt of the facts known about Flag prior to the time the [c]ourt entered the order presented by Thompson Coburn.

15. That Thompson Coburn breached the said contract when it failed to advise Magna, prior to having said order entered appointing [Flag] successor trustee, that if such appointment took place a merger, as described in [p]aragraph 12, would occur and of the consequences and risks of such merger.

16. That Thompson Coburn breached said contract when it advised Magna to transfer the trust assets, including the trust bonds, which it held without a trust after said dissolution and termination took place, to Flag with out [*sic*] a court order compelling it so to do.

17. That Thompson Coburn breached said contract when it failed to advise Magna of the consequences and risks of transferring said trust assets to Flag with out [*sic*] a court order compelling it so to do.

18. That Thompson Coburn breached said contract when it failed to advise Magna that the injured plaintiff-payees were not bound by any order entered in the [t]rial or [a]ppellate [c]ourts in the SBU v. Magna litigation.

19. That Thompson Coburn breached said contract when it failed to advise

29

Magna that a transfer of the trust assets and bonds to Flag was the equivalent to transferring said trust assets and bonds to Gibson.

20. That Thompson Coburn breached said contract when it failed to advise Magna that a stipulated agreed order cannot be enforced against anyone except the parties to the stipulation.

21. That Thompson Coburn breached said contract when it failed to advise Magna that a [d]eclaratory [j]udgment [a]ction, or [m]otion, should be filed with the injured plaintiffs and SBU as parties thereto seeking a declaration as to the appropriate disposition of the bonds and trust assets being held by Magna with out [*sic*] the existence of a trust prior to the transfer of said trust assets and bonds to Flag.

22. That Thompson Coburn breached said contract when it failed to advise Magna of the consequences and risks of transferring said trust assets and bonds to Flag without an order issued pursuant to such a [d]eclaratory [j]udgment action or [m]otion.

23. That Thompson Coburn breached said contract when it failed to advise Magna that an equitable constructive trust could be imposed on the trust assets, or an equitable estoppel could be applied, to prevent the said trust assets from being given to Gibson.

24. That Thompson Coburn breached said contract by advising Magna to join with SBU in notifying the injured plaintiffs that Flag was a corporate trustee, well knowing that Flag was not a corporate trustee as required by the trust agreements, intending thereby to induce the injured plaintiffs into believing that Flag was an appropriate corporate trustee as required by the agreement.

25. That Thompson Coburn breached said contract by failing to advise Magna of the consequences and risks of performing a deceptive act in falsely representing to

30

the injured plaintiffs that Flag was a corporate trustee with the possibility of liability under the Consumer Fraud and Deceptive Practices Act.

26. That Thompson Coburn breached said contract by advising and allowing Magna to join with SBU in presenting Flag to the [c]ircuit [c]ourt for appointment and confirmation as successor corporate trustee and in joining in with SBU in identifying Flag as successor corporate trustee.

27. That Thompson Coburn breached said contract by advising Magna to join SBU in obtaining the appointment of Flag as successor corporate trustee with out [*sic*] notice to the injured plaintiffs of such presentation.

28. That Thompson Coburn breached said contract by failing to advise Magna not to join in any notice to the injured plaintiffs of the appointment and identity of a successor corporate trustee without any order of the court requiring Magna so to do.

29. That as a consequence and direct result of one or more of said breaches of Thompson Coburn's contract with Magna, Magna violated its contractual and fiduciary obligations to the injured plaintiffs, transferred the trust assets and bonds to the nominee of Flag and Gibson in January, 1998, and as a result of which, [Magna] has paid and expended large sums of money in settling and paying damages to the injured plaintiffs and in legal fees and expenses in defending actions brought against Magna by the said injured plaintiffs, when Gibson, the alter ego of both SBU and Flag, came into possession of the said bonds and dissipated same for his own purposes, causing the injured plaintiffs to lose large sums of money, thereby, and to bring damage suits against Magna seeking payment for their losses."

After several weeks of trial, the jury found in favor of Magna, awarding Magna $3,654,606.40 in damages. Magna moved for a new trial on the issue of damages or, in the alternative, for a new trial on all the issues. Thompson Coburn moved for a judgment

31

notwithstanding the verdict. The trial court denied both motions. This appeal follows.

ANALYSIS

As mentioned above, Magna appeals, contending that the trial court erred in (1) "refusing to grant a new trial on the issue of damages[] or alternatively failing to grant a new trial on all the issues" and (2) "requiring the plaintiff to elect between [c]ount I, the professional negligence count, and [c]ount II, the contract count." Thompson Coburn cross-appeals, arguing that we should reverse the trial court and enter a judgment notwithstanding the verdict because the trial court erred as a matter of law when it found that Magna owed the injured plaintiffs a fiduciary duty. Due to the nature of Thompson Coburn's cross-claim, we address it first.

I. Thompson Coburn's Cross-Appeal

A. *Magna's "Case Within a Case"*

The issue presented here calls for us to determine whether Magna was required to prove a "case within a case" to recover damages for Thompson Coburn's alleged malpractice. This issue has been complicated by the fact that Magna has failed to cite any legal authority in support of its positions and by Thompson Coburn's insistence that its "appeal is straightforward" and that but for the trial court's ruling that Magna owed the injured plaintiffs a fiduciary duty, Magna's case would have been dismissed or a pretrial judgment would have been entered in Thompson Coburn's favor.

This appeal is not "straightforward," and Thompson Coburn's argument misses the mark. It is a long-standing principle that it is the duty of the attorneys to present to the court the authorities supporting their position and to assist the court in reaching the correct result. *Kelley v. Kelley*, 317 Ill. 104, 107 (1925). "Reviewing courts are entitled to have issues clearly defined [and] to be cited pertinent authorities and are not a depository in which an appellant is to dump the entire matter of pleadings, court action, argument[,] and research[,]

32

as it were, upon the court." *In re Estate of Kunz*, 7 Ill. App. 3d 760, 763 (1972); *47th & State Currency Exchange, Inc. v. B. Coleman Corp.*, 56 Ill. App. 3d 229, 232 (1977). Nevertheless, "in the interest of doing substantial justice between the litigants and although it is not the duty of this court to search the record to determine what the real issues are or to seek material for the disposition of such issues" (*Martin v. 1727 Corp.*, 120 Ill. App. 3d 733, 740 (1983)), we have done so in this case.

In the matter at hand, no matter how Magna chose to frame its claim, *i.e.*, negligence or breach of contract, Magna's cause of action sounded in legal malpractice. See *Land v. Greenwood*, 133 Ill. App. 3d 537, 541 (1985) ("[A]n action for legal malpractice is one sounding in tort which arises out of a contract, express or implied, for legal services"); *Hanumadass v. Coffield, Ungaretti & Harris*, 311 Ill. App. 3d 94, 99-100 (1999). "The basic principles governing legal malpractice claims are well established." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 225 (2006). "To prevail on a legal malpractice claim, the plaintiff client must plead and prove that the defendant attorneys owed the client a duty of due care arising from the attorney-client relationship, that the defendants breached that duty, and that as a proximate result, the client suffered injury." *Tri-G, Inc.*, 222 Ill. 2d at 225-26. "The injury in a legal malpractice action is not a personal injury, nor is it the attorney's negligent act itself." *Tri-G, Inc.*, 222 Ill. 2d at 226. "Rather, it is a pecuniary injury to an intangible property interest caused by the lawyer's negligent act or omission." *Tri-G, Inc.*, 222 Ill. 2d at 226. "The fact that the attorney may have breached his duty of care is not, in itself, sufficient to sustain the client's cause of action." *Tri-G, Inc.*, 222 Ill. 2d at 226. "Even if negligence on the part of the attorney is established, no action will lie against the attorney unless that negligence proximately caused damage to the client." *Tri-G, Inc.*, 222 Ill. 2d at 226. "The existence of actual damages is therefore essential to a viable cause of action for legal malpractice." *Tri-G, Inc.*, 222 Ill. 2d at 226 (citing *Northern Illinois Emergency*

33

*Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306-07 (2005)).

On cross-appeal, Thompson Coburn contends that the trial court erred when it ruled that a fiduciary duty ran from Magna to the injured plaintiffs. Thompson Coburn alleges that but for that ruling, Magna's case would have been dismissed or a pretrial judgment would have been entered in its favor. It reasons that absent a duty running from Magna to the injured plaintiffs, nothing Thompson Coburn did or did not do could have caused Magna to breach a duty and expose it to liability in the underlying injured plaintiffs' lawsuits. In support of its argument Thompson Coburn relies on *Claire Associates v. Pontikes*, 151 Ill. App. 3d 116, 123 (1986), for this proposition of law: "[A malpractice plaintiff must] plead a valid underlying claim, lost because of [the defendants'] negligence. [Citations.] Absent such a valid cause of action, no set of facts would entitle [the plaintiffs] to any recovery." Thompson Coburn avers that the trial court's fiduciary duty ruling was Magna's case-within-a-case and that, without that ruling, Magna is unable to prove the required elements of proximate cause and damages. Magna counters that it was not required to prove that it owed fiduciary duties to the injured plaintiffs. Rather, Magna argues, "[Magna] had only to prove that it was forced to settle because of the likelihood that the injured plaintiffs could recover damages on any theory when Magna followed Thompson Coburn's faulty advice and 'but for' that advice, Magna would have never been put in such position."

Causation requires both proof of "cause in fact" and proof of "legal cause." *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 354 (1992). There are generally two tests used by courts when considering cause in fact: (1) the traditional "but for" test and (2) the "substantial factor" test. *Thacker*, 151 Ill. 2d at 354. Under the but-for test, "a defendant's conduct is not a cause of an event if the event would have occurred without it." *Thacker*, 151 Ill. 2d at 354. Under the substantial-factor test, "the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about." *Thacker*,

34

151 Ill. 2d at 354-55. Magna in the present case sought to prove causation through the but-for test.

"Legal cause 'is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of a type which a reasonable man would see as a likely result of his conduct.' " *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 456 (1992) (quoting *Masotti v. Console*, 195 Ill. App. 3d 838, 845 (1990)). "Thus, an injury will be found not to be within the scope of the defendant's duty if it appears 'highly extraordinary' that the breach of the duty should have caused the particular injury." *Lee*, 152 Ill. 2d at 456. "Illinois law does not require unequivocal or unqualified evidence of causation." *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 91 (2002).

Here, Magna did not have to prove its case-within-a-case to recover damages for Thompson Coburn's transactional malpractice. The gist of Thompson Coburn's claim is that Magna could not prove proximate cause without proving a case-within-a-case. We acknowledge that in malpractice cases based upon the attorney's conduct during litigation, *i.e.*, the prosecution or defense of a prior claim, a plaintiff must generally prove a case-within-a-case to establish proximate cause. *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 200 (2006); *Tri-G, Inc.*, 222 Ill. 2d at 226. "This is required because of the damages element of the action; no malpractice exists unless counsel's negligence has resulted in the loss of an underlying action." *Beastall v. Madson*, 235 Ill. App. 3d 95, 100 (1992). "The objective is to establish what the result *should have been* ***." (Emphasis in original.) *Nika v. Danz*, 199 Ill. App. 3d 296, 308 (1990). We hold, however, that proving a case-within-a-case is not always required in transaction-based legal malpractice cases where damages can otherwise be established. See *Glass v. Pitler*, 276 Ill. App. 3d 344, 351 (1995) ("[I]f damages resulting from the legal malpractice action can be otherwise factually established, a judicial determination in the underlying action is not required").

35

In the case at bar, Magna could recover all the damages proximately caused by Thompson Coburn's breach. See *Metrick v. Chatz*, 266 Ill. App. 3d 649, 655 (1994); *Glass*, 276 Ill. App. 3d at 349; *Gruse v. Belline*, 138 Ill. App. 3d 689, 697 (1985). This is so because a successful legal malpractice claim places the plaintiff in the same position that the plaintiff would have occupied but for the attorney's negligence. *Nettleton v. Stogsdill*, 387 Ill. App. 3d 743, 749 (2008); *Sterling Radio Stations, Inc. v. Weinstine*, 328 Ill. App. 3d 58, 64 (2002). "[A]n attorney's liability for failing to advise a client of the foreseeable risks attendant to a given course of legal action is not predicated upon the impropriety of the recommended course of action; rather, it is predicated upon the client's exposure to a risk that the client did not knowingly and voluntarily assume." *Metrick*, 266 Ill. App. 3d at 654-55. "Consequently, to establish the element of proximate cause, it is necessary for the client to both plead and prove that had the undisclosed risk been known, he or she would not have accepted the risk and consented to the recommended course of action." *Metrick*, 266 Ill. App. 3d at 655. "Such is not the case, however, when the course of action the attorney recommends is in itself improper under the circumstances presented." *Metrick*, 266 Ill. App. 3d at 655. "If an attorney's advice falls below the standard of reasonable legal services, any damages which proximately flow from the client's acceptance of that advice are recoverable in a negligence action against the attorney." *Metrick*, 266 Ill. App. 3d at 655.

Here, Magna alleged and the jury found that because of Thompson Coburn's faulty advice it was sued by the injured plaintiffs and forced to pay legal expenses to defend itself against those lawsuits, which Magna ultimately had to settle. Thus, Magna could have recovered the legal expenses it paid in defending the cases brought against it even if Magna had not settled those cases and had ultimately succeeded on the merits. See *Belden v. Emmerman*, 203 Ill. App. 3d 265, 270 (1990) ("We believe that plaintiffs should have realized that even if the circuit court's order were reversed and the settlement were set aside,

36

damages would still be present. A reversal of the settlement order between Adler and the landlord would not have alleviated the additional damages occasioned by the loss of the business or the additional expenses caused by defendants' alleged malpractice. In short, the only difference between affirmance and reversal is the amount of damage sustained"); but see *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 355 (1998) ("Admittedly, where an attorney's neglect is a direct cause of the legal expenses incurred by the plaintiff, the attorney fees incurred are recoverable as damages. [Citations.] However, the converse of this rule is equally true: where an attorney's neglect is *not* a direct cause of the legal expenses incurred by the plaintiff (*i.e.*, the plaintiff prevails when sued or loses for reasons other than incorrect legal advice), the attorney fees incurred are generally not actionable. Since it is also possible the former client will prevail when sued by a third party, damages are entirely speculative until a judgment is entered against the former client or he is forced to settle" (emphasis in original)). Whether it was reasonable for Magna to settle those cases against it and whether the amount Magna paid in defending those cases was reasonable were questions of fact for the jury.

Indeed, in *Nettleton v. Stogsdill*, 387 Ill. App. 3d 743 (2008), the appellate court dismissed an argument similar to Thompson Coburn's allegation that Magna must prove a case-within-a-case in order to maintain its malpractice claim. In *Nettleton*, the plaintiff alleged that as a direct result of her lawyer's negligence in her dissolution proceeding, she incurred additional attorney fees. The trial court granted a summary judgment in the law firm's favor, "finding that plaintiff failed to present evidence that she suffered actual damages that were proximately caused by defendants' alleged negligence." *Nettleton*, 387 Ill. App. 3d at 747.

On appeal, the law firm argued that the trial court correctly determined that its alleged malpractice was not proximately related to the plaintiff's claimed injuries because the law

firm did not cause the plaintiff to lose her dissolution cause of action. *Nettleton*, 387 Ill. App. 3d at 754. The law firm argued, "[A] legal malpractice plaintiff must demonstrate that, as a result of the defendant's negligence, the plaintiff lost his cause of action, and, if the plaintiff's cause of action remained viable at the time the defendant was discharged, the plaintiff cannot prove any set of facts that would demonstrate that the defendant's conduct caused the plaintiff's injury." *Nettleton*, 387 Ill. App. 3d at 754.

In rejecting the law firm's argument, the appellate court stated, "[T]his argument must fail because the law upon which defendants rely does not apply except where a plaintiff alleges that but for the defendant's malpractice the plaintiff would not have irretrievably lost the cause of action." *Nettleton*, 387 Ill. App. 3d at 754. "None of the cases cited by defendants involves a plaintiff who alleges that, as a result of the defendant's negligence, the plaintiff incurred attorney fees in an attempt to rectify the damage caused by the defendant's negligence." *Nettleton*, 387 Ill. App. 3d at 755. "Where a plaintiff alleges that the defendant's malpractice caused her to incur attorney fees to rectify the defendant's malpractice, the plaintiff need not demonstrate that her cause of action was lost to establish the existence of her injury, because she has not alleged that she was injured by the loss of her cause of action." *Nettleton*, 387 Ill. App. 3d at 755. "Rather, to establish her injury, the plaintiff must establish that she incurred additional attorney fees." *Nettleton*, 387 Ill. App. 3d at 755. "If she is unable to do so, then she is also unable to establish that the defendant's malpractice caused her to incur additional attorney fees, because she has not established that she actually did incur additional attorney fees." *Nettleton*, 387 Ill. App. 3d at 755.

Similarly, in *Sorenson v. Fio Rito*, 90 Ill. App. 3d 368 (1980), the plaintiff brought an attorney malpractice action against her attorney as the result of her attorney's failure to timely file certain inheritance and estate tax forms. The circuit court awarded the plaintiff damages in the form of penalties and interest that the plaintiff was required to pay because the forms

were filed late and attorney fees which arose from unsuccessful attempts to obtained refunds of the penalty and interest charges. The attorney appealed, alleging, *inter alia*, that the trial court had erred in awarding as damages the attorney fees incurred by the plaintiff in her unsuccessful attempts to obtain refunds of the penalty and interest charges.

In analyzing the attorney's argument, the court stated as follows:

"We do not believe [that the policy against awarding attorney fees] was intended to preclude a plaintiff from recovering losses directly caused by the defendant's conduct simply because those losses happen to take the form of attorneys' fees. The plaintiff here is not attempting to recover the attorneys' fees she expended in bringing this lawsuit. Rather, she seeks to recover losses incurred in trying to obtain refunds of tax penalties which were assessed against her solely as a result of the defendant's negligence. Had the plaintiff been forced to hire an accountant to repair the damage caused by the defendant's conduct, she would undoubtedly have been entitled to recover the accountant's fee as an ordinary element of damages. There is no basis in logic for denying recovery of the same type of loss merely because the plaintiff required an attorney instead of an accountant to correct the situation caused by the defendant's neglect. In holding the defendant liable for the plaintiff's losses, we are not violating the policy against 'penalizing' a litigant for defending a lawsuit. We are simply following the general rule of requiring a wrongdoer to bear the consequences of his misconduct." *Sorenson*, 90 Ill. App. 3d at 372.

Here, Magna alleged that Thompson Coburn breached its duty to Magna in advising Magna regarding its termination as the trustee, not in the prosecution or defense of a claim. To explain it another way, Magna did not allege that Thompson Coburn was negligent in its representation of Magna in the SBU v. Magna litigation or in its representation of Magna when Thompson Coburn represented Magna after the injured plaintiffs brought suit against

Magna. Rather, Magna alleged that, in giving Magna faulty advice, Thompson Coburn breached its duty to Magna and that, because of the faulty advice, Magna was sued by the injured plaintiffs and forced to defend and ultimately settle those lawsuits. As a result, Magna claimed as damages the legal expenses it paid in defending the cases against it and the amounts it paid in ultimately settling those cases.

Magna pled and proved that had the undisclosed risks been known regarding appointing Flag as the successor corporate trustee, Magna would not have accepted those risks and would not have consented to the recommended course of action. See *Metrick*, 266 Ill. App. 3d at 655; *Serafin v. Seith*, 284 Ill. App. 3d 577, 587 (1996); *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 351 (2000). In fact, that was the sole reason Magna hired Thompson Coburn: to protect it from potential lawsuits by the injured plaintiffs if their suspicions about Gibson came to be true. The jury determined that Thompson Coburn failed in that regard, and it found that Magna was damaged by being forced to engage in litigation it otherwise would not have been required to engage in. This was the proximate-cause determination in this case, and we will not invade the province of the jury. See *Judge*, 221 Ill. 2d at 210 (" 'The issue of proximate causation in a legal malpractice setting is generally considered a factual issue to be decided by the trier of fact' " (quoting *Renshaw v. Black*, 299 Ill. App. 3d 412, 417 (1998))). Further, the jury was not given an instruction requiring Magna to prove a case-within-a-case, and Thompson Coburn has not alleged that it was error for the court not to do so.

Magna's case-within-a-case went to the amount of damages Magna could recover, not to whether Magna could recover at all. In any event, the jury must have found that Magna proved its case-within-a-case because it awarded Magna more than just its legal expenses. It was not error for the jury to do so. In reality, the legal landscape facing Magna in early 2002 was unclear. Magna was being sued by the injured plaintiffs in James, Topsakalyan,

40

McCracken, Gaudreault, and Hicks on a number of different legal theories for transferring the trusts to Flag. While in Topsakalyan Magna received a favorable ruling when the trial court granted Magna's motion to dismiss with prejudice on December 5, 2002, that ruling was being appealed, and on April 24, 2003, Magna received an unfavorable ruling in McCracken when Judge LeChien granted a partial summary judgment against Magna regarding liability. Magna had been dealt two inconsistent hands and had to decide whether to fold and settle or to play through with the uncertainty of not knowing what hand it would be dealt next. Magna settled, and it had the right to do so. See *N.E. Finch Co. v. R.C. Mahon Co.*, 54 Ill. App. 3d 573, 575 (1977) ("Without question, the law favors amicable settlements between litigants. In furtherance of this policy, rules should not be encouraged which allows a defendant no alternative but to litigate the question of his liability to a plaintiff in order to preserve his cause of action over against a prospective indemnitor. It is therefore unnecessary for a party seeking indemnity to obtain a judicial determination that it is liable to an injured party [citation], so long as that in settling the principal action, the prospective indemnitee is responding to a reasonable anticipation of personal liability"); see also *Faier v. Ambrose & Cushing, P.C.*, 154 Ill. 2d 384, 387 (1993) ("[A] claim against an attorney for recovery of a settlement may be based upon implied indemnity"); *cf. Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1032 (7th Cir. 2000) ("A plaintiff in a legal malpractice suit is not required to prove to a certainty that he would have won (or lost less) had it not been for the negligence of its lawyer, but he must show that a victory of some sort, even if just partial, was more likely than not"). This is nothing more than the long-standing principle that "where the natural and proximate consequences of a wrongful act have been to involve the plaintiff in litigation with others, there may be a recovery in damages against the author of such act, measured by the reasonable expenses incurred in such litigation" (*Ritter v. Ritter*, 381 Ill. 549, 554-55 (1943)).

41

Here, the question of whether Magna was responding to a reasonable anticipation of personal liability when it settled with the injured plaintiffs was a question for the trier of fact. See *Sorenson*, 90 Ill. App. 3d at 376 (finding that it is the province of the trier of fact to determine whether the plaintiff's efforts in her unsuccessful attempts to mitigate damages were reasonable). If Thompson Coburn thought that Magna did not owe the injured plaintiffs a duty, fiduciary or otherwise, or that the claims brought against Magna by the injured plaintiffs had no merit, Thompson Coburn could have defended Magna when it had the opportunity to do so. Thompson Coburn was asked to idemnify Magna after Judge LeChien entered the summary judgment against Magna, and Thompson Coburn declined. Thompson Coburn cannot now ask the court to go back and determine that Magna had no right to settle the cases against it. See *N.E. Finch Co.*, 54 Ill. App. 3d at 577 (" '[W]here the indemnitor denies liability under the indemnity contract and refuses to assume the defense of the claim, then the indemnitee is in full charge of the matter and may make a good[-]faith settlement without assuming the risk of being able to prove absolute legal liability or the actual amount of the damage. *** A contrary rule would make the right to settle meaningless in cases where the indemnitor has denied liability' " (quoting *Chicago, R.I. & P.R. Co. v. Dobry Flour Mills, Inc.*, 211 F.2d 785, 788 (10th Cir. 1954))). Again, whether Magna showed that the settlement was reasonable and made in good faith was a question of fact for the jury.

We find our analysis consistent with the supreme court's logic and reasoning in *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, No. 70410 (Ill. December 4, 1992), *different results reached on reh'g*, 158 Ill. 2d 240 (1994), an opinion that we acknowledge was superseded and vacated by a later opinion. See *Long v. City of New Boston*, 91 Ill. 2d 456, 462 (1982) ("Though decisions of this court are final when the opinion is filed [citation], a later modification of a filed opinion supersedes and vacates the earlier opinion"). Nevertheless, we believe that the language employed and the reasons set forth in the earlier

opinion provide some guidance to the case at hand. See *Welton v. Hamilton*, 344 Ill. 82, 98 (1931) (denial of second petition for rehearing) ("When a rehearing is allowed and the cause further considered it is the decision of the court, rather than the language employed or the reasons given in the opinion, which is the subject of reconsideration"); *cf. People v. Brooks*, 173 Ill. App. 3d 153, 157 (1988) ("While a modification to an opinion following a rehearing does supersede and vacate the earlier opinion [citation], this did not occur here. Rather, the petition for rehearing was denied, and the modification concerned a matter completely unrelated to the *voir dire* issue originally addressed by the supreme court in the July 31, 1984, *Zehr* opinion. Therefore the modification of the unrelated issue did not supersede and vacate that portion of *Zehr* dealing with *voir dire*. As a result, the law as set forth in *Zehr* on July 31 was clearly applicable to the *voir dire* proceeding in defendants' case").

In *Jackson Jordan, Inc.*, the plaintiff, a manufacturer and seller of railroad-track-maintenance equipment, asked its law firm whether a new track-maintenance machine it was planning to build and market would infringe on any existing patents. The law firm concluded that the new machine would not infringe on any unexpired patents, and the firm sent a letter to the plaintiff stating that it did " 'not find any unexpired patents that would present any infringement problems.' " *Jackson Jordan, Inc.*, No. 70410, slip op. at 1 (December 4, 1992). Following this advice, the plaintiff proceeded with its plans to manufacture and market the machine and other similar machines. Several years later, however, a competitor in the railroad-track-maintenance-equipment industry alleged that the plaintiff's track-maintenance machines infringed on its patent. After several rounds of litigation, the United States Court of Appeals for the Federal Circuit agreed. See *Jackson Jordan, Inc. v. Plasser American Corp.*, 824 F.2d 977 (Fed. Cir. April 23, 1987) (table). All that remained to be resolved was the amount of the competitor's damages.

The plaintiff then invited the law firm to take part in the settlement negotiations with

43

the competitor and, at the same time, advised the law firm of its intention to sue it for malpractice. The law firm declined to participate in the negotiations and withdrew as the plaintiff's counsel. The plaintiff and the competitor settled the dispute for $1.9 million.

The plaintiff then filed a legal malpractice suit against the law firm, alleging that the law firm had failed to examine and review the competitor's patent when it was issued and when the plaintiff requested the opinion regarding its new machine and had negligently failed to advise it that its machines might infringe upon its competitor's patent. The plaintiff requested the $1.9 million it settled for, along with $350,000, the approximate amount of the legal fees it had incurred over the course of its patent litigation with the competitor.

The circuit court granted a summary judgment in favor of the law firm on the ground that the action was barred by the five-year limitations period applicable to legal malpractice claims. The court found that the applicable limitations period began to run against the plaintiff no later than the date of the letter in which the competitor announced its intention to pursue a patent infringement action against the plaintiff. The plaintiff appealed, and the appellate court affirmed. *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 199 Ill. App. 3d 728 (1990).

On appeal to the Illinois Supreme Court, the issue was the determination, under the discovery rule, of the date the plaintiff knew, or reasonably should have known, that the plaintiff had been injured. The supreme court gave the following analysis:

"As we have noted, [the plaintiff's] primary contention before this court is that the company's malpractice action against the *** law firm could have accrued as late as September 1987, when the amount of [the plaintiff's] liability to [its competitor] was finally determined, but no earlier than November 1984, when the appeals court first delivered an adverse decision in that litigation. [The plaintiff] maintains that its malpractice action would have been premature if it had been filed prior to that span

44

of time. [The plaintiff] asserts that the decisions of the courts below, which place the discovery date before that period, effectively abolish the requirements of proximate cause and actual damages, elements of a legal malpractice action. In support of this contention, [the plaintiff] cites a number of legal malpractice cases in which the occurrence of the clients' injuries was found to depend on the results eventually achieved in the underlying litigation. [Citations.] Applied to the circumstances of this case, [the plaintiff's] argument necessarily implies that if [its competitor's] patent had been found invalid, or if the [plaintiff] machines had been found not to infringe on it, then [the plaintiff] could not have brought a cause of action for legal malpractice. We do not believe that [the law firm's] duty to its clients was as narrow as [the plaintiff's] argument assumes.

We agree with [the law firm] that the malpractice allegedly committed in the present case [could not] be characterized as involving simply 'the loss of an underlying cause of action or the loss of a meritorious defense if the attorney was defending in the underlying suit.' [Citation.] The basis for [the plaintiff's] claim of negligence in the present case is the [law firm's] failure in 1973, and earlier, to properly search the patent records and to advise the company that its planned track maintenance machines 'infringed or possibly infringed' on [its competitor's patent].

Accordingly, [the law firm's] duty in preparing the patent clearance letter in 1973 was not merely to protect its client from meritorious patent infringement actions, but, in a broader sense, to protect it against the uncertainty and expense even of ultimately unsuccessful challenges to its products. A company's proportionate share of the relevant market, its relationships with its competitors, and its relationships with its customers can all be important considerations when the company determines how aggressive or cautious it wishes to be in the development of new products. In the

present case, [the plaintiff] wanted to be sure, before it expended substantial sums in the development and production of [its product] and its progeny, that the new track maintenance machines would not be the target of competitors' patent infringement claims.

Thus, [the plaintiff's] twin arguments–that its cause of action for malpractice could not accrue until it settled the infringement claim with [its competitor] or, at the earliest, until it suffered its first adverse judicial decision in that litigation–fail to accommodate the full extent of [the law firm's] undertaking. ***

In the present case, [the law firm] allegedly breached its duty of care to its client when, in 1973, it advised [the plaintiff] that the company's planned track maintenance machine faced no 'infringement problems.' Injury thus would have occurred once the client was faced with the expense of defending a patent infringement claim, regardless of its eventual outcome. Although a finding of infringement in the underlying litigation with the patent holder would support a claim of malpractice, [the plaintiff] could have maintained its action even without a judicial declaration of infringement. For example, a finding that [the competitor] was barred from recovering damages for the alleged infringement on the grounds of *laches* or estoppel, the two defenses [the law firm] proposed, would not defeat [the plaintiff's] claim that the law firm was negligent in having failed to advise the company of the [competitor's] patent. By the same token, even a finding of patent invalidity would still mean that the client had been unnecessarily subjected to the expense and uncertainty of litigation. As a manufacturer preparing to embark on the development and production of a major new product, [the plaintiff] sought its attorneys' assurance that its new machine would not leave the company vulnerable to the expense and distraction of patent infringement claims. Having given [the plaintiff] that advice, the

[law] firm could later be responsible for simply exposing its client to unwanted litigation.

As [the law firm] notes, expenses occasioned by the wrongful acts of a third party may be compensable as damages. [Citations.] Here, the injury is not only the cost to [the plaintiff] of its settlement with [its competitor], but includes as well legal fees incurred by [the plaintiff] in ascertaining the status and significance of the [competitor's previous] litigation in 1980 and, later, in defending its products against [the competitor's] eventual claim. In the present case, then, the outcome of the patent litigation would have determined the extent, but not the existence, of the client's damages. See *Belden v. Emmerman* (1990), 203 Ill. App. 3d 265, 270, 560 N.E.2d 1180 (client sustained injury without regard to result reached in underlying litigation; with respect to appeal of that judgment, 'the only difference between affirmance and reversal is the amount of damage sustained' by the client).

For these reasons, we conclude that [the plaintiff's] claim against [the law firm] could have accrued prior to November 1984 and did not need to await a determination of [the plaintiff's] damages in the settlement of its claim, or even an adverse judicial declaration upholding [the competitor's] patent. Adopting [the plaintiff's] theory in the circumstances shown here would require–or permit–a party to delay bringing suit until all possible consequences of the alleged malpractice are known. That result is neither necessary nor desirable. If in any particular case an accurate assessment of the client's damages depends on the outcome of other, pending litigation, proceedings on the malpractice claim need only be stayed until those damages are more definitely known." *Jackson Jordan, Inc.*, No. 70410, slip op. at 8-11 (December 4, 1992).

The supreme court then went on to determine there was no question of fact regarding the time of the discovery of the malpractice claim, and it affirmed the judgment of the

appellate court. *Jackson Jordan, Inc.*, No. 70410, slip op. at 12-15 (December 4, 1992). After this opinion was filed, a petition for rehearing was allowed and the supreme court subsequently modified its decision. In the later opinion, the supreme court reversed the appellate court, finding that a question of fact existed regarding when the plaintiff discovered its injury. *Jackson Jordan, Inc.*, 158 Ill. 2d at 250-51. While the later opinion did not include the language and reasons set forth in the earlier opinion that we find helpful today, the later opinion did not discredit this language and we find that it provides some guidance to our decision today. In fact, the original dissenting justice in *Jackson Jordan, Inc.*, who authored the later majority opinion, stated in his original dissent, "I fully agree that the defendant's duty was as broad as the majority describes it ***." *Jackson Jordan, Inc.*, No. 70410, slip op. at 17 (December 4, 1992) (Heiple, J., dissenting). This strengthens our belief in the validity of the principles set forth. See *Lebron v. Gottlieb Memorial Hospital*, Nos. 105741, 105745, slip op. at 12-13 (February 4, 2010) (discussing the weight to be afforded *dicta*).

Like in *Jackson Jordan, Inc.*, the malpractice committed here cannot be characterized as simply involving the loss of any underlying cause of action or the loss of a meritorious defense to an underlying suit. The basis for Magna's claim was Thompson Coburn's failure to properly advise it how to terminate its position as the trustee while exposing it to the least amount of risk. Thompson Coburn failed to do that and as a result could be found liable for the reasonable exposure and expenses to which Magna was subjected. Our decision today is limited to transaction-based legal malpractice cases.

B. *Collateral Estoppel*

Thompson Coburn contends that the circuit court never should have analyzed the question of whether or not Magna owed a fiduciary duty to the injured plaintiffs. Thompson Coburn argues that Magna was collaterally estopped from raising that issue in this lawsuit

because that issue had already been litigated by the First District Appellate Court in *Topsakalyan.*

"Collateral estoppel is an equitable doctrine that prevents a party from relitigating an issue that has been decided in a prior proceeding." *Preferred Personnel Services, Inc. v. Meltzer, Purtill & Stelle, LLC*, 387 Ill. App. 3d 933, 944 (2009). "When properly applied, collateral estoppel, also referred to as issue preclusion, promotes fairness and judicial economy by preventing the relitigation of issues that have already been resolved in earlier actions." *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 77 (2001). "Collateral estoppel may be applied when [1] the issue decided in the prior adjudication is identical with the one presented in the current action, [2] there was a final judgment on the merits in the prior adjudication, and [3] the party against whom estoppel is asserted was a party to, or in privity with a party to, the prior adjudication." *Du Page Forklift Service, Inc.*, 195 Ill. 2d at 77.

"In order to operate as an estoppel, the facts sought to be relitigated must have been specifically litigated and necessarily decided." *Gelsomino v. Gorov*, 149 Ill. App. 3d 809, 812 (1986) (citing *Oberman v. Byrne*, 112 Ill. App. 3d 155, 160 (1983)). "There must have been a decision with respect to a specific fact in the prior judgment that was material and controlling in that case and also material and controlling in the pending case." *Gelsomino*, 149 Ill. App. 3d at 812. " 'It must also conclusively appear that the matter of fact was so in issue that it was necessarily determined by the court rendering the judgment interposed as a bar by reason of such estoppel.' " *Gelsomino*, 149 Ill. App. 3d at 812-13 (quoting *People ex rel. Chicago & Eastern Illinois R.R. Co. v. Fleming*, 42 Ill. 2d 231, 235 (1969)). "Nonetheless, even where the threshold elements of the doctrine are satisfied[] and an identical common issue is found to exist between a former and current lawsuit, collateral estoppel must not be applied to preclude parties from presenting their claims or defenses

49

unless it is clear that no unfairness results to the party being estopped." *Preferred Personnel Services, Inc.*, 387 Ill. App. 3d at 944-45 (citing *Kessinger v. Grefco, Inc.*, 173 Ill. 2d 447, 467-68 (1996)).

Here, the threshold requirements for collateral estoppel have not been met. The issue decided in the prior adjudication is not identical with the issue presented in this case. A close reading of *Topsakalyan* reveals that the issue decided there was limited to whether Magna owed a fiduciary duty to the injured plaintiffs as trust beneficiaries. See *Topsakalyan v. Gibson*, No. 1-03-0539 (2005) (unpublished order pursuant to Supreme Court Rule 23). Here, however, the injured plaintiffs brought suit against Magna under a number of different legal theories, not simply on the basis that the injured plaintiffs were trust beneficiaries. These theories were not addressed in *Topsakalyan*. See *Topsakalyan*, order at 20 (ruling that the trial court did not abuse its discretion in denying the plaintiffs' motion to amend its complaint because "[i]n effect, [the] plaintiffs desire a 'do over' as the result of what they perceive as missteps by their original appellate counsel").

Further, even if the threshold requirements of the doctrine were met, we find that it would be highly unfair to Magna to apply collateral estoppel to it. On December 5, 2002, when the Cook County circuit court granted Magna's motion to dismiss in Topsakalyan, Magna had several downstate claims pending against it brought by the injured plaintiffs. Topsakalyan was being appealed and the appellate court decision was not filed until March 25, 2005. In the meantime, Magna had a summary judgment entered against it in McCracken and other adverse rulings in the downstate cases, which led Magna to settle. Magna could not use Topsakalyan as a bar in the downstate claims that were eventually settled, and it would be highly unfair to allow Thompson Coburn to use collateral estoppel to now bar Magna from proving its malpractice case.

Furthermore, we fail to see how applying collateral estoppel in this case would

50

promote the other purpose behind the doctrine of collateral estoppel–judicial economy. This case has already been fully litigated and tried by a jury. Applying collateral estoppel at this point would not promote judicial efficiency because we would not be preventing the relitigation of issues that have already been resolved in earlier actions. See *Du Page Forklift Service, Inc.*, 195 Ill. 2d at 77 ("When properly applied, collateral estoppel *** promotes fairness and judicial economy by preventing the relitigation of issues that have already been resolved in earlier actions"). Collateral estoppel does not apply in this case.

## II. Magna's Motion for a New Trial

Magna contends that the trial court erred in denying it a new trial on the issue of damages alone or, alternatively, a new trial on all the issues. Magna contends, "An award of damages in the amount of $3,654,606.40 is 'manifestly inadequate.' " We disagree.

"It is well established that, in an appeal from a jury verdict, a reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury." *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). "Indeed, a reviewing court may reverse a jury verdict only if it is against the manifest weight of the evidence." *Snelson*, 204 Ill. 2d at 35. "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence." *Snelson*, 204 Ill. 2d at 35.

"The determination of whether a new trial should be granted rests within the sound discretion of the trial court, whose ruling will not be reversed unless it reflects an abuse of that discretion." *Snelson*, 204 Ill. 2d at 36. " 'If the trial judge, in the exercise of his discretion, finds that the verdict is against the manifest weight of the evidence, he should grant a new trial; on the other hand, where there is sufficient evidence to support the verdict of the jury, it constitutes an abuse of discretion for the trial court to grant a motion for a new trial.' " *Snelson*, 204 Ill. 2d at 36 (quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 456 (1992)).

"In determining whether the trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial." *Maple*, 151 Ill. 2d at 455. "Verdicts are to be liberally construed, however, and may be amended to conform to the pleadings and evidence contained in the record whenever the intention of the jury is clear." *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 171-72 (1994).

"Illinois courts have repeatedly held that the amount of damages to be assessed is peculiarly a question of fact for the jury to determine [citations] and that great weight must be given to the jury's decision [citations]." *Snelson*, 204 Ill. 2d at 36-37. "Indeed, a court reviewing a jury's assessment of damages should not interfere unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered." *Snelson*, 204 Ill. 2d at 37. "If a jury's award falls within the flexible range of conclusions reasonably supported by the evidence, it must stand." *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1138 (2000); see also *Posner v. Davis*, 76 Ill. App. 3d 638, 645 (1979). "Illinois has long recognized the applicability, in questions of damages, of the doctrine of avoidable consequences, which prevents a party from recovering damages for consequences which that party could reasonably have avoided." *Maere v. Churchill*, 116 Ill. App. 3d 939, 946 (1983). In making this determination, we consider the record as a whole. *Snelson*, 204 Ill. 2d at 37.

As mentioned previously, at the trial, Magna argued that it should be awarded approximately $11,789,053, consisting of $1,084,419 it paid Thompson Coburn in attorney fees, $997,486 it paid the Freeark Firm in attorney fees, $1,478,721 it paid to settle Gaudreault, $2.5 million it paid to settle Hicks, and $5,728,425 it paid to settle McCracken and James. In its verdict, the jury found that Magna lost the full amount of damages claimed by Magna as a result of Thompson Coburn's breach but found that Magna could have saved

approximately $8,134,446 had it exercised reasonable effort and ordinary care. Thus, the jury awarded Magna approximately $3,654,606. We find this award to be reasonably related to the loss suffered and within the flexible range of conclusions supported by the evidence. Thus, the circuit court did not abuse its discretion in denying Magna a new trial.

Magna argues in its reply brief, however, that because Thompson Coburn had the right to defend Magna and mitigate damages in the cases brought against it by the injured plaintiffs but refused to defend Magna, Thompson Coburn has no right to quarrel with the settlements reached by Magna. See *Karas v. Snell*, 11 Ill. 2d 233, 247-49 (1957). While Magna did ask Thompson Coburn to indemnify it in the cases brought against it by the injured plaintiffs, Magna did not make this argument to the trial court or in its opening brief, and therefore, this issue has been waived. *E.g.*, *People v. Bounds*, 171 Ill. 2d 1, 56 (1995); *Gruse*, 138 Ill. App. 3d at 697; 210 Ill. 2d R. 341(h)(7) ("Points not argued [in an appellant's initial brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"). In truth, throughout the trial, evidence was presented regarding whether it was reasonable for Magna to settle the cases it had against it, and the jury was instructed on whether Magna could have mitigated its damages.

Over the course of the trial, the jury heard conflicting testimony on the amount of damages Magna sustained as a result of Thompson Coburn's breach. Evidence was presented by experts on both sides regarding the reasonableness of Magna's decision to settle and regarding the amounts it paid to settle the Gaudreault, McCracken, James, and Hicks cases. Expert testimony was also presented on whether it was reasonable for Magna to recoup the attorney fees it had paid Thompson Coburn and the Freeark Firm in defending Magna in the lawsuits brought against it by the injured plaintiffs. Based upon this conflicting evidence, the jury could have reduced the award to Magna relying upon a number of things.

For example, the Freeark Firm testified that it thought that Judge LeChien was wrong

in granting Magna a partial summary judgment in the McCracken case and that Magna had a very high likelihood of having that ruling reversed on appeal. Nevertheless, Magna chose to settle McCracken and James rather than appeal the partial summary judgment. The McCracken and James settlements totaled $5,728,425, with Magna agreeing to pay between 50% and 90% of the net losses associated with the 1998 transfers. Based upon this evidence, the jury could have concluded that Magna was not reasonable in settling these cases or not reasonable in settling for this amount, especially considering Magna's attorney's belief that Magna had a "very high likelihood" of having the McCracken ruling reversed on appeal.

Further, there was also testimony from the Freeark Firm that Magna's liability in Hicks did not stem from Thompson Coburn's acts and that Magna would not be able to recover from Thompson Coburn any amounts it paid in settling Hicks. Magna settled the Hicks case for $2.5 million. Nevertheless, Magna argued that it should recover this $2.5 million. Experts argued both for and against whether Magna should be able to recover this amount. Again, the jury could have concluded that all or portion of this amount was unreasonable.

Furthermore, in a letter to Magna from the Freeark Firm prior to settling McCracken and James and Hicks, the Freeark Firm ranked the trust companies as the least culpable of all the other parties involved, including Gibson, SBU, Helfrey, Ducey, and others associated with SBU. The Freeark Firm also represented to Magna that of all the trust companies, Magna was "probably in the best position." Despite this, evidence was presented that Magna paid more to settle than any other defendant. Thompson Coburn's expert testified that it was not reasonable for Magna to settle because Magna had minimal exposure at best and paid nearly twice as much as any other defendant. The jury certainly could have used this evidence in determining the amount of its verdict.

The jury also heard evidence that Magna's attorneys, the Freeark Firm, agreed to settle the James, McCracken, and Hicks cases on the agreement that the Freeark Firm would draft

an amended complaint against its own client, Magna, alleging for the first time in those cases that Magna, through the actions of Thompson Coburn, had breached fiduciary duties to the injured plaintiffs by transferring the trusts to Flag, and that the injured plaintiffs' attorneys would file that complaint in their respective cases. Again, evidence was presented on both sides regarding the propriety of this conduct.

Additionally, there was evidence that Thompson Coburn notified Magna in May 1999 that a confidential source informed Thompson Coburn that it believed that the trust money Magna transferred to Flag flowed from Flag to SBU and then from SBU to Gibson. Magna's president at that time, Finn, testified that the confidential source had suggested that Magna perform a "laundry list of things" but that Magna told Thompson Coburn that Magna thought it was too late. Magna did not authorize Thompson Coburn "a significant amount of money to go chasing these rabbits down these holes" because there was not enough direct evidence to go forward with–"it was simply allegations from an anonymous source." The jury could have inferred from this that Magna should have taken some action at this point to try and mitigate the damages.

In sum, the jury heard evidence across the board regarding the amount of damages in this case. Not surprisingly, the experts on both sides disagreed with everything from whether Magna should have settled the cases in the first place to the amount Magna paid in settlement. At the end of the day, the jury took this conflicting testimony into deliberations and determined that Magna should recover $3,654,606 of the $11,789,053 in alleged damages incurred by Magna. It was the jury's role to resolve the conflicts in the evidence, to make credibility determinations, and to decide the weight to be given to the witnesses' testimony. We will not usurp that function. See *Orzel v. Szewczyk*, 391 Ill. App. 3d 283, 293 (2009). A review of the record reflects that this verdict was far from being against the manifest weight of the evidence, and the trial court did not abuse its discretion in denying the

request for a new trial on the issue of damages or on all the issues.

III. Magna's Election Between the Contract Count and the Negligence Count

Magna's second point is that the circuit court erred in requiring it to elect between count I, the professional negligence count, and count II, the contract count. Thompson Coburn counters that Magna was not required to make this election but, instead, elected to go to the jury solely on the contract count of its second amended complaint. While we agree with Magna that "a complaint against a lawyer for professional malpractice may be couched in either contract or tort and that recovery may be sought in the alternative" (*Collins v. Reynard*, 154 Ill. 2d 48, 50 (1992)), we disagree with Magna that it was required by the court to elect which count would go the jury.

"It is well established that a plaintiff may have only one satisfaction for an injury." *Touche Ross & Co.*, 159 Ill. 2d at 172. Here, both the tort count and the contract count were based upon the same facts and sought a recovery for the same injury. Thus, Magna could not have recovered under both theories. Nevertheless, Magna contends the trial court erred by making it go forward with only the breach-of-contract count.

Looking at all the circumstances, we disagree. From the moment the contract theory was added (approximately six weeks into the trial), Magna's attorney, Carr, declared that Magna was "not going to the jury on both counts." He further stated, "I would elect before we go to the jury, because I think it's very confusing if I don't." The same day, Carr contended: "I have the right under the law to let both counts go the jury and make the election after judgment, but *I'm going to waive that right at this point in time*. I'm not going to waive the right as to when I get to make the election." (Emphasis added.) At this point, Magna waived its right to take both counts to the jury. See *Tri-City Jewish Center v. Blass Riddick Chilcote*, 159 Ill. App. 3d 436, 440 (1987) ("Waiver occurs whenever a party intentionally relinquishes a known right, either expressly or by conduct inconsistent with an

56

intent to enforce that right").

While Magna was not required to elect which count it wished to pursue before final judgment, once Magna waived its right, which Carr indicated he was aware Magna had, it became irrevocable and could not be revived. See *Blass Riddick Chilcote*, 159 Ill. App. 3d at 440 ("A waiver once made is irrevocable and cannot be revived"); *cf. Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 316 Ill. App. 3d 998, 1011 (2000) (holding that once the plaintiff expressly elected it wished to abandon its remedy of damages in favor of being excused from the contract, the plaintiff's election became final and irrevocable); *Sluka v. Bielicki*, 335 Ill. 202, 210 (1929) ("Where the doctrine of election of remedies applies[,] the bar arises as soon as the choice is made[] and becomes full and absolute against the other remedy at the time of the filing of the petition, declaration[,] or claim").

Indeed, Magna acknowledged twice that it elected which count it would proceed upon after waiving its right to send both counts to the jury. At the jury-instruction conference, when Thompson Coburn tried to offer an instruction related to legal malpractice, Carr objected and argued: "We dismissed that count. We elected to go on the contract, and it is not a legal malpractice case."

Later at the trial, while examining his last rebuttal witness, Carr stated to the witness, "You understand that the court had decided that this case is going to be submitted under the part of the pleading that discusses an implied contract?" Immediately following this question, Thompson Coburn's attorney interjected and stated, "The court didn't decide that," to which Carr replied, "Well, the plaintiff has elected and the court has approved that this case would go to the jury on the *** complaint that alleges an implied contract was entered between Magna and Thompson Coburn." Magna cannot waive a right in open court, repeatedly state on the record that it elected which count would go to the jury, and then claim that the trial court erred by requiring it to elect which count to proceed with.

57

While the court did later tell Carr, after he had told the court that he had waived Magna's right to take both counts to the jury, that Magna's election would have to be made prior to closing argument, by this point Magna had already waived its right to take both counts to the jury. Further, when Thompson Coburn requested the court to compel Carr to elect which count he would take to the jury, prior to the court ruling anything, Carr stated: "Well, I'm not going to keep you in suspense anymore. Once I get my exhibits in and offered *** I am going to elect to go on the contract count." Carr then reassured Thompson Coburn and the court of Magna's decision by stating: "We're going to go on the contract. Don't worry about it." Carr never objected or stated that he was being forced to elect, and he did not argue to the court that he wanted to submit both counts to the jury. To the contrary, he consistently informed the court that only one count would go to the jury.

Later on during the instruction conference, Carr did state to the court that he was withdrawing his election. Shortly after this statement, however, a brief recess was taken, and once the parties were back in open court, Thompson Coburn stated that Carr had elected to proceed with the contract count. Again, Carr never objected or said anything to the court after this statement was made.

Further, even if we found that Magna had not waived its right and had been required by the court to elect which count would go to the jury, we would not be inclined to reverse the judgment because Magna has failed to demonstrate how it was prejudiced. *Schaffner v. Chicago & North Western Transportation Co.*, 161 Ill. App. 3d 742, 754 (1987) ("Generally, an error is not reversible unless it is shown that the error was substantially prejudicial and thereby unduly affected the outcome of the trial"), *aff'd*, 129 Ill. 2d 1 (1989); *Greig v. Johnson*, 22 Ill. App. 3d 646, 652 (1974) ("[W]e would not be inclined to reverse the judgment unless [the] defendant *** demonstrated that she was prejudiced by the change [citation], especially where the result on remand would likely be the same").

58

Here, Magna has not alleged how it was prejudiced or how the alleged error would have affected the outcome of the trial. Magna was allowed to present all of its evidence to the jury and acknowledged that it would have been foolish to take both counts to the jury, and from a practical standpoint, this was likely a part of Carr's trial strategy to avoid the jury receiving instructions on tort affirmative defenses, like contributory negligence, by choosing to proceed only on the contract count. Thus, we find Magna's contention to be without merit.

Not only that but if anything, Carr, by informing the court that he was not going to take both counts to the jury and by waiving that right, induced the court to allegedly require him to elect which count to take to the jury. Carr cannot now complain of this alleged error. See *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) ("Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented").

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

SPOMER and STEWART, JJ., concur.

NO. 5-08-0497

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

<table>
<tr><td>UNION PLANTERS BANK, N.A.,</td><td>)</td><td>Appeal from the</td></tr>
<tr><td></td><td>)</td><td>Circuit Court of</td></tr>
<tr><td>Plaintiff-Appellant and</td><td>)</td><td>Madison County.</td></tr>
<tr><td>Cross-Appellee,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>No. 04-L-791</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>THOMPSON COBURN LLP,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Honorable</td></tr>
<tr><td>Defendant-Appellee and</td><td>)</td><td>Daniel J. Stack,</td></tr>
<tr><td>Cross-Appellant.</td><td>)</td><td>Judge, presiding.</td></tr>
</table>

**Opinion Filed**:     June 3, 2010

**Justices**:     Honorable James M. Wexstten, J.

Honorable Stephen L. Spomer, J., and
Honorable Bruce D. Stewart, J.,
Concur

**Attorney
for
Appellant**
Rex Carr, The Rex Carr Law Firm, LLC, 412 Missouri Avenue, East St. Louis,
IL 62201

**Attorneys
for
Appellee**
Carol A. Hogan, Morgan R. Hirst, Jones Day, 77 West Wacker Drive, Chicago, IL
60601; Michael J. Nester, Donovan, Rose, Nester & Joley, P.C., 8 East Washington
Street, Belleville, IL 62220